[Cite as *State v. Hebdon*, 2013-Ohio-1729.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NOS. CA2012-03-052 |
| | | CA2012-03-062 |
| | : | |
| - vs - | : | O P I N I O N |
| | : | 4/29/2013 |
| KEVIN L. HEBDON, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY AREA III COURT
Case Nos. CRB110728 and CRB1101318


Michael T. Gmoser, Butler County Prosecuting Attorney, Kimberly L. McManus, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Jeremy L. Evans, 306 South Third Street, Hamilton, Ohio 45011, for defendant-appellant


**HENDRICKSON, P.J.**

{¶ 1} Defendant-appellant, Kevin Hebdon, appeals his conviction in the Butler County Area III Court for sexual imposition.

{¶ 2} In May 2011, appellant was charged with two counts of sexual imposition, misdemeanors of the third degree, in violation of R.C. 2907.06(A)(1). The charges stemmed from allegations that appellant had touched his stepdaughter, B.S., on her breast and buttocks in September 2010 and April 2011.

{¶ 3} Prior to trial, appellant filed several motions for discovery, including a Notice of Exculpatory Evidence and Motion for Disclosure on September 26, 2011. In his motion, appellant requested that the state furnish two diaries belonging to B.S. During a hearing on the motion, the prosecution argued that it had already disclosed the relevant portions of B.S.'s diaries, and that allowing appellant to read the remaining portions of the diaries would only result in more trauma for B.S. Conversely, the defense argued that appellant was entitled to B.S.'s diaries in their entirety under Crim.R. 16(B). Ultimately, the trial court conducted an in camera inspection of the diaries to determine if they contained additional evidence requiring disclosure.

{¶ 4} After the in camera review, the court proceeded directly to a bench trial, without allowing appellant to review the remaining portions of B.S.'s diaries. Thus, presumably, the trial court denied appellant's motion for disclosure. *See State v. Wagner*, 12th Dist. No. CA2002-07-056, 2003-Ohio-2369, ¶ 3 ("when faced with a silent record, [a reviewing court] will presume that any outstanding motions at the conclusion of the proceeding have been overruled").

{¶ 5} At trial, B.S. testified that she had lived with her mother, her brothers, and appellant since she was roughly two years old. B.S. testified that in early September 2010, when she was 14 years old, she was lying in the middle of her bed reading a book, when appellant entered her room and laid down on the bed next to her while talking to her mother on the phone. B.S. stated that appellant placed the phone on hold, so that her mother could not hear the noises in B.S.'s bed. At that point, B.S. claimed that appellant placed his left hand on her right breast. B.S. explained that appellant used his hand to cup her breast "completely * * * including the nipple and areola." B.S. also testified that appellant would often ask her whether her breasts were real or "fake," but she could not specifically recall

whether appellant made any such comment that night.

{¶ 6} B.S. also explained that on numerous evenings when her mother was at work, appellant would ask to stay in B.S.'s bed for the entire night. Further, B.S. testified that in the months leading up to the September 2010 incident, appellant often told her that she looked "super hot or cute," and would call her "baby * * * in an uncomfortable way." Additionally, appellant would compare B.S.'s breast size to her mother's breast size, and told B.S. that if he were younger and not married to her mother, that he would date her.

{¶ 7} B.S. then testified that in April 2011, she was in the family computer room doing her homework, when appellant approached her to talk about an upcoming school dance. Appellant gave B.S. permission to go to the dance, but B.S. told him that she did not want to go, and that she had other plans. At that point, appellant grabbed B.S.'s hands and made her dance with him. According to B.S., appellant first placed his hands on B.S.'s upper waist and asked, "[i]s this how boys dance with you?" Appellant then moved his hands below her waist, and said, "or like this?" B.S. testified that at that point, appellant lifted her up by her buttocks and swung her around. B.S. stated that she had to hit appellant's chest to make him let go of her, and that when he finally put her down, he left the room and appeared upset.

{¶ 8} During cross-examination, the defense asked B.S. about two diaries that she kept in 2010 and 2011. The defense asked B.S. about a specific entry in one of the diaries, entitled "[T]op ten list of reasons why [I] don't like Kevin," which listed "felt me up (cleavage)" as the number one reason. B.S. indicated that she had included this entry because appellant's touching of her breasts was "important" to her. B.S. also testified that she sometimes wrote in her diary to express anger and other "personal things," such as her problems with her physical appearance and the lack of attention that people paid to her.

{¶ 9}  The defense also questioned B.S. about a text message that she received from a friend at some point after the September 2010 incident, asking whether appellant had "touched [her] again." B.S. explained that when appellant discovered the text message, he confiscated her phone and gave it to her mother. Before her mother left for work the next day, she and appellant confronted B.S. about the text message. B.S. testified that she was not comfortable speaking with her mother in front of appellant, but that when appellant left the room, she told her mother that appellant had touched her. However, B.S. immediately told her mother that she was "not a hundred percent sure that anything had happened." When the defense asked B.S. why she failed to tell her mother the whole story, B.S. explained, "I knew she was going to work and I didn't want to start anything right then and there since she was leaving." B.S. also testified that she did not want to start anything because of the stress it would cause the rest of her family.

{¶ 10} Lastly, B.S. testified on cross-examination about a conversation that she had with the police shortly after she made the allegations against appellant. B.S. admitted to telling the police that during the September 2010 incident, appellant sat, rather than laid, on her bed, and that prior to touching her breast, appellant said that he wanted to make sure that her breasts were not "fake."

{¶ 11} After B.S. testified, B.S.'s grandmother, J.S., took the witness stand. J.S. testified that on several occasions within the last year, she saw appellant approach B.S. from behind and hug her "very tightly * * *." J.S. also stated that appellant would sometimes place his head in B.S.'s lap while she sat on the sofa, which "creeped" J.S. out.

{¶ 12} Next, B.S.'s mother, R.H., testified for the defense. R.H. testified that she was not alarmed by the fact that appellant had laid on B.S.'s bed in September 2010. R.H. further testified that when she confronted B.S. about the text message from her friend, B.S. was "not

very forthcoming with any response at all * * *."  R.H. stated that before leaving for work,

> I was trying to encourage [B.S.] to open up and talk to me.  So I asked her, you know, was this true?  Had [appellant] touched her?  Finally, her response was yes.  And then she immediately said, I'm not sure anything really happened.  So I asked her to try to give me some specific details, you know, was she dressed?  She said that she was.  Was he dressed?  She said he was, you know, was the touch just on the breast?  She said yes, but, again, she wasn't sure anything had really happened.

{¶ 13}  When R.H. spoke to B.S. several weeks later, B.S. told her that she was sure that appellant had actually touched her, and indicated that, "well, [appellant] failed [a] polygraph test so that confirms everything."  R.H. stated that this was the extent of her conversation with B.S. about the allegations.

{¶ 14}  R.H. also testified that she believed that appellant was joking when he asked B.S. whether her breasts were "fake."  According to R.H., appellant told her that he was simply trying to ease the tension while asking B.S. whether she was being bullied for her physical appearance at school.  Appellant also told R.H. that he never touched B.S.'s breast.  As to the April 2011 incident, appellant told R.H. that he was concerned that B.S. was afraid to attend her first middle school dance because of the provocative dancing that might occur.  Appellant told R.H. that he had placed his hands on B.S.'s buttocks simply to show what type of contact was inappropriate.

{¶ 15}  After R.H.'s testimony, appellant testified that he had always been concerned about B.S.'s large breast size, as well as her immodest wardrobe choices, which included low-cut shirts that showed too much cleavage.  As a result, one night before school began in September 2010, appellant sat on B.S.'s bed and asked her if she was being teased at school for her breast size.  According to appellant, at some point in the middle of the conversation, R.H. called appellant's cell phone.  Appellant explained that he placed R.H. on hold to finish the conversation with B.S., and that, in an effort to make B.S. more

comfortable, he said, "I can't even believe that * * * my little girl is this big. * * * * I ought to poke you to see if it's real." Appellant stated that he reached his finger toward B.S.'s sternum area, but that B.S. grabbed his hand and lowered it away from her chest. Appellant explained that it was only a "stupid joke," and that he immediately tried to apologize for making B.S. uncomfortable. Regarding the April 2011 incident, appellant admitted that he placed his hands on B.S.'s buttocks. However, appellant stated that he only intended to show B.S. what type of touching would be inappropriate at the middle school dance.

{¶ 16} Appellant also testified that he did not become physically aroused when he attempted to touch B.S.'s breast, or when he touched her buttocks. Appellant also explained that he was very affectionate with all of his children, including B.S., and that he was raised in an "extremely physical" family where "snuggling" was normal, even as an adult. He also stated that he would often place his head in all of his children's laps, and that they would do the same to him. Appellant further testified that, after reading B.S.'s diary entries about her problems with her physical appearance, he tried to be more affectionate toward her to boost her self-esteem.

{¶ 17} During cross-examination, the prosecution asked appellant about a polygraph test that he took before any charges were filed. During the polygraph exam, Detective Steve Oakes of the West Chester Police Department asked appellant whether he had touched B.S.'s breast in September 2010. Initially, appellant denied touching B.S.'s breast. However, appellant subsequently told the detective, "I will admit that I probably * * * poked [B.S.'s] breasts," but explained that it was nothing but a "horrible joke." Appellant later stated, "I feel like it happened, and I convinced myself it didn't. But it did happen that I touched her breasts." When Detective Oakes asked appellant whether he touched B.S.'s breast and buttocks for sexual reasons, appellant responded, "[m]aybe subconsciously."

{¶ 18} The trial court subsequently found appellant guilty of both charges and sentenced him accordingly.

{¶ 19} Appellant timely appeals, raising three assignments of error. For ease of analysis, we will review appellant's first and second assignments of error together.

{¶ 20} Assignment of Error No. 1:

{¶ 21} THE STATE'S EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION FOR TWO COUNTS OF SEXUAL IMPOSITION.

{¶ 22} Assignment of Error No. 2:

{¶ 23} THE CONVICTION FOR TWO COUNTS OF SEXUAL IMPOSITION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 24} In his first and second assignments of error, appellant argues his conviction was against the manifest weight of the evidence, and was not supported by sufficient evidence. Specifically, appellant claims that his conviction for sexual imposition was in error, because there was no evidence that he touched B.S. for the purpose of sexually arousing or gratifying either person.

{¶ 25} Manifest weight and sufficiency of the evidence are quantitatively and qualitatively different legal concepts. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. *State v. Stringer*, 12th Dist. No. CA2012-04-095, 2013-Ohio-988, ¶ 27. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded on other grounds*.

{¶ 26} While the test for sufficiency requires an appellate court to determine whether the state has met its burden of production at trial, a manifest weight challenge examines the inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other. *Stringer* at ¶ 28. In determining whether a conviction is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*, citing *State v. Cummings*, 12th Dist. No. CA2006-09-224, 2007-Ohio-4970, ¶ 12.

{¶ 27} While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, these issues are primarily matters for the trier of fact. *State v. Walker*, 12th Dist. No. CA2006-04-085, 2007-Ohio-911, ¶ 26. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances to correct a manifest miscarriage of justice, and only when the evidence presented at trial weighs heavily in favor of acquittal. *Thompkins*, 78 Ohio St.3d at 387.

{¶ 28} "Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. Thus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Stringer*, 2013-Ohio-988 at ¶ 30, quoting *State v. Wilson*, 12th Dist. No. CA2006-01-007, 2007-Ohio-2298, ¶ 35.

{¶ 29} Here, appellant was convicted of sexual imposition in violation of R.C. 2907.06(A)(1), which states:

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

(1) The offender knows that the sexual contact is offensive to the other person, or one of the other persons, or is reckless in that regard.

{¶ 30} Appellant claims his conviction for sexual imposition was not supported by sufficient evidence and was against the manifest weight of the evidence because the state failed to prove that he had "sexual contact" with B.S. According to R.C. 2907.01(B), sexual contact means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

{¶ 31} The Revised Code does not define "sexual arousal or gratification." *In re Anderson*, 116 Ohio App.3d 441, 443 (12th Dist.1996). The trier of fact must determine from the evidence presented whether the purpose of the defendant was sexual arousal or gratification by his contact. *Id.*; *State v. Stair*, 12th Dist. No. CA2001-03-017, 2002 WL 42900, * 4 (Jan. 14, 2002). In making its decision, "the trier of fact may consider the type, nature and circumstances of the contact, along with the personality of the defendant." *State v. Barnes*, 12th Dist. No. CA2010-06-009, 2011-Ohio-5226, ¶ 88. From this evidence, the trier of fact may infer what the defendant's motivation was in making the physical contact with the victim. *Id.* "If the trier of fact determines that the defendant was motivated by desires of sexual arousal or gratification, and that the contact occurred, then the trier of fact may conclude that the object of the defendant's motivation was achieved." *Id.*, quoting *State v. Gesell*, 12th Dist. No. CA2005-08-367, 2006-Ohio-3621, ¶ 24.

{¶ 32} Initially, appellant claims that B.S.'s testimony regarding the type, nature, and

circumstances of the contact was so "fundamentally inconsistent," that it could not establish that they had contact for the purpose of sexual arousal or gratification. In support of his argument, appellant first cites B.S.'s testimony that, during the September 2010 incident, she was lying in the middle of her bed when appellant came into her room, muted his phone, and touched her breast without saying anything. Appellant attempts to discredit this testimony by arguing that it was physically impossible for a six-foot-two, two-hundred-pound man to lie next to B.S. in bed while she laid in the middle. Appellant also asks, "[w]hy would he mute the phone if he didn't say anything to [B.S.]?" However, it is well established that the weight to be given to the evidence and the credibility of the witnesses are primarily for the trier of fact. *Walker*, 2007-Ohio-911 at ¶ 26; *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

{¶ 33} Appellant also argues that B.S.'s testimony regarding the April 2011 incident was unreasonable, because it was physically impossible for him to pick her up by her buttocks in the manner she testified. Again, it was the province of the trial court, as the trier of fact, to consider the reasonableness of B.S.'s testimony in light of the other evidence presented at trial.

{¶ 34} Appellant also points to other "indecisive" testimony from B.S., including her statement to the police that appellant had touched the "top" of her breast, versus her trial testimony that he also grabbed her nipple and areola. However, during trial, B.S. clearly explained that she considered the top of her breast to include the nipple and areola. Further, we reject appellant's claim that B.S. was not a credible witness simply because she initially told her mother that she was "not a hundred percent sure that anything had happened." During trial, B.S. explained that at first, she was reluctant to tell her mother because she was leaving for work, but that she did eventually tell her mother about appellant's behavior.

{¶ 35} Appellant also argues that the trial court failed to consider his testimony that he was joking when he attempted to poke B.S.'s breast. Appellant further claims that, due to his "demonstrating personality type," he felt that it was appropriate to show B.S. the proper versus improper ways to dance with boys by placing his hands on her buttocks. Lastly, appellant asserts that the trial court should have considered his affectionate personality in determining whether he touched B.S. for the purposes of sexual arousal or gratification.

{¶ 36} Once again, this court will not substitute its judgment for that of the trial court unless it is patently apparent that the court lost its way in arriving at its verdict. Here, the trial court did not lose its way simply because it chose to believe B.S., which it was entitled to do. B.S.'s testimony, if believed, was sufficient for the court to infer that appellant's motive was sexual arousal or gratification of either person. As discussed above, B.S. testified that appellant touched her breast while she was lying alone in her bed, while her mother was at work. There was no evidence that appellant's hand was on B.S.'s breast by accident. Additionally, appellant often compared B.S.'s breast size to her mother's breast size, and called her "super hot or cute," and "baby," which made B.S. uncomfortable. In this context, these statements clearly have a sexual connotation. *See State v. Edwards*, 8th Dist. No. 81351, 2003-Ohio-998, ¶ 24 (evidence that defendant touched the victim's breasts while the victim was alone in her mother's bedroom and said "you are mine" was sufficient to prove that defendant's motive was sexual arousal or gratification); *State v. Bragg*, 2d Dist. No. 19491, 2004-Ohio-659 (trial court did not err in finding purpose of sexual gratification, where father touched his daughter's breasts and said "titty twister," despite father's claim that he was "joking or playing around"); *State v. Franklin*, 4th Dist. Nos. 05CA20, 05CA21, 2006-Ohio-6369.

{¶ 37} As for the incident when appellant touched B.S.'s buttocks, B.S. testified that

appellant refused to let go until she began to hit his chest, at which point he released her and became visibly upset. Further, it is difficult to believe appellant's testimony that he touched B.S.'s buttocks for the legitimate purpose of showing her how not to dance with boys, when B.S. specifically told appellant that she had no intentions of going to the dance.

**{¶ 38}** Upon review, we find that there was ample evidence that appellant touched B.S.'s breast and buttocks for the purpose of sexual arousal or gratification.

**{¶ 39}** Appellant does not argue that the state failed to prove the remaining essential elements of sexual imposition, and having reviewed the evidence, we find that appellant's conviction was not against the manifest weight of the evidence. *See State v. Collins*, 8th Dist. No. 82200, 2003-Ohio-4817, ¶ 19-26.

**{¶ 40}** Having found that the weight of the evidence supports appellant's conviction, any issues concerning sufficiency of the evidence must be similarly disposed of. *See Stringer*, 2013-Ohio-988 at ¶ 30.

**{¶ 41}** Appellant's first and second assignments of error are overruled.

**{¶ 42}** Assignment of Error No. 3:

**{¶ 43}** THE DEFENDANT WAS PREJUDICED IN HIS ABILITY TO PRESENT A REASONABLE DEFENSE DUE TO NONCOMPLAINCE WITH THE RULES OF EVIDENCE [sic.]

**{¶ 44}** In his third assignment of error, appellant claims the trial court violated his due process rights when it failed to order the state to disclose the remaining portions of two diaries belonging to B.S. Appellant also claims the trial court erred in conducting an in camera inspection of the diaries in order to determine whether additional disclosure was necessary.

**{¶ 45}** During discovery, the state disclosed an entry in one of B.S.'s diaries, stating

that appellant had "felt [B.S.] up" in her cleavage area. However, appellant sought disclosure of B.S.'s diaries in their entirety, because he believed that they contained exculpatory evidence. As a result, the trial court reviewed B.S.'s diaries in camera, in order to determine whether they contained additional discoverable material. Although the trial court did not issue a written decision on the matter, it is clear that the court ultimately denied appellant's motion for disclosure.

{¶ 46} The granting or overruling of discovery motions in a criminal case rests within the sound discretion of the court. *State v. Blake*, 12th Dist. No. CA2011-07-130, 2012-Ohio-3124, ¶ 14. Abuse of discretion is more than an error of law or judgment; it implies that the trial court's decision was unreasonable, arbitrary or unconscionable. *Id.*, citing *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶ 47} Crim.R. 16 governs discovery in criminal cases. Appellant claims he had a right to review B.S.'s diaries in their entirety pursuant to Crim.R. 16(B)(5) or (7). Crim.R. 16(B)(5) requires the state to disclose any evidence "favorable to the defendant and material to guilt or punishment * * *." Crim.R. 16(B)(7) requires the disclosure of "[a]ny written or recorded statement by a witness in the state's case-in-chief, or that it reasonably anticipates calling as a witness in rebuttal."

{¶ 48} However, Crim.R. 16 permits a prosecuting attorney to decline to disclose the requested evidence, so long as the prosecutor certifies that the nondisclosure is for one of the five reasons enumerated in Section (D), which states:

> (D) Prosecuting Attorney's Certification of Nondisclosure. If the prosecuting attorney does not disclose materials or portions of materials under this rule, the prosecuting attorney shall certify to the court that the prosecuting attorney is not disclosing material or portions of material otherwise subject to disclosure under this rule for one or more of the following reasons:
>
> (1) The prosecuting attorney has reasonable, articulable grounds

to believe that disclosure will compromise the safety of a witness, victim, or third party, or subject them to intimidation or coercion;

(2) The prosecuting attorney has reasonable, articulable grounds to believe that disclosure will subject a witness, victim, or third party to a substantial risk of serious economic harm;

(3) Disclosure will compromise an ongoing criminal investigation or a confidential law enforcement technique or investigation regardless of whether that investigation involves the pending case or the defendant;

(4) The statement is of a child victim of sexually oriented offense under the age of thirteen;

(5) The interests of justice require non-disclosure.

**{¶ 49}** It would appear from recent case law that, as long as the reason for the nondisclosure satisfies one of the factors listed in Crim.R. 16(D), an oral certification during a hearing before the parties is sufficient. *See State v. Thompson*, 6th Dist. Nos. L-08-1208, L-09-1214, 2011-Ohio-5046, ¶ 128 (finding that "at the hearings on witness certifications, the state provided [sufficient] reasons for requesting witness protection on the record and evidence that the witnesses bore an undue risk of harm is their identities"); *State v. Collins*, 8th Dist. No. 89529, 2008-Ohio-578 (the state satisfied nondisclosure certification requirement during a hearing).

**{¶ 50}** During the hearing on appellant's motion to disclose, the prosecution clearly explained its reasons for the nondisclosure, stating, "we've given over the relevant portions * * * [and] if these allegations are true, I think it would just be more trauma for this girl to have this man reading her diary." With this, the prosecution demonstrated reasonable, articulable grounds to believe that additional disclosure would subject B.S. to intimidation or coercion by appellant, in accordance with Crim.R. 16(D)(1). Arguably, the nondisclosure would have also served the interests of justice. Crim.R. 16(D)(5).

{¶ 51} Once the state properly certified its reason for withholding the remaining portions of B.S.'s diaries, the onus was on appellant to invoke the review process under Crim.R. 16(F), which states:

> Upon motion of the defendant, the trial court shall review the prosecuting attorney's decision of nondisclosure * * * for abuse of discretion during an in camera hearing conducted seven days prior to trial, with counsel participating.

{¶ 52} Here, appellant did not request the trial court to review the state's certification of nondisclosure. Because appellant failed to invoke the review process under Crim.R. 16(F), it appears that the trial court did what it felt was most appropriate under the circumstances in order to rule on appellant's motion for disclosure. Under the facts of this case, we cannot say that the trial court's decision to conduct an in camera inspection outside the presence of the parties, while somewhat unconventional, prejudiced appellant in any way.

{¶ 53} Even if the state failed to properly certify its reason for nondisclosure, we would reject appellant's argument that he was entitled to B.S.'s diaries under either Crim.R. 16(B)(5) or (7). In order to require discovery under these subsections, appellant first had to demonstrate that the remaining portions of B.S.'s diaries were "related to the particular case indictment, information, or complaint, and * * * [were] material to the preparation of a defense, or [were] intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant * * *." Crim.R. 16(B).

{¶ 54} Here, there is no indication that appellant requested to have copies of B.S.'s diaries sealed and placed in the record to preserve this issue for appellate review. Because the diaries were not included in the record, we cannot find that the evidence requested was related to the particular case, indictment, or complaint, or that it was material to the preparation of appellant's defense. *See State v. Darrah*, 12th Dist. No. CA2006-09-109, 2007-Ohio-7080, ¶ 29. Further, during the hearing on appellant's motion for disclosure, the

prosecution made it clear that it did not intend to use the remaining portions of B.S.'s diaries during trial. Lastly, appellant cannot claim that the diaries were obtained from or belonged to him.

{¶ 55} In sum, without the diaries, it is impossible for appellant to show that he was entitled to the remaining portions under Crim.R. 16(B)(5) or (7), or that he was prejudiced by the trial court's decision to deny his motion for disclosure.

{¶ 56} Accordingly, appellant's third assignment of error is overruled.

{¶ 57} Judgment affirmed.


S. POWELL and M. POWELL, JJ., concur.