[Cite as *State v. Davenport*, 2014-Ohio-2800.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                          :          APPEAL NO. C-130307
                                                   TRIAL NO.  B-1002888
    Plaintiff-Appellee,             :

 vs.                                    :          *O P I N I O N.*

ROBERT DAVENPORT,                       :

    Defendant-Appellant.            :


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause
                            Remanded

Date of Judgment Entry on Appeal:  June 27, 2014


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

Office of the Hamilton County Public Defender*, David Hoffman, Christine Y. Jones* and *Josh Thompson*, Assistant Public Defenders, for Defendant-Appellant.


Please note:  this case has been removed from the accelerated calendar.

**FISCHER, Judge.**

{¶1} Defendant-appellant Robert Davenport appeals his convictions, following a jury trial, for the aggravated murder of Lincoln Lewis, with an accompanying firearm specification, and having a weapon while under a disability.

{¶2} In eight assignments of error, he argues that (1) the trial court erred by granting the state's motion to withhold discoverable evidence until trial; (2) multiple instances of prosecutorial misconduct denied him a fair trial; (3) the trial court abused its discretion in denying his motion for a mistrial; (4) his counsel rendered ineffective assistance; (5) the trial court erred by denying his Crim.R. 29 motion for an acquittal; (6) and (7) his convictions were not supported by the sufficiency and weight of the evidence; and (8) that his sentences were contrary to law.

{¶3} Because the trial court failed to make the necessary findings to impose consecutive prison terms, we vacate the consecutive sentences. We remand this cause to the trial court to determine whether consecutive sentences are appropriate, and, if so, to make the necessary findings on the record. We affirm the trial court's judgment in all other respects.

### *A Murder for Sunglasses*

{¶4} On the afternoon of April 12, 2010, Lincoln Lewis, an aspiring rapper, was walking to the store when Davenport and another man approached him near the intersection of Hickory and Harvey Streets in the Avondale area of Cincinnati. Davenport stepped in front of Lincoln, as if he was going to hug him, but then shot him in the abdomen. As Lincoln lay on the ground dying, Davenport took his Cartier sunglasses, went through his pockets, and took his cell phone. In his haste to flee from the scene, Davenport dropped Lincoln's cell phone. Agnes Williams, who had witnessed the shooting on her way back from the store, ran to Lincoln's aid. She picked up

Lincoln's cell phone, which was lying on the ground next to his body, and comforted him until the police and medical personnel arrived on the scene.

{¶5}    Minutes later, the police arrived and secured the scene, while medical personnel rushed Lincoln to the hospital. Lincoln died shortly after arriving at the hospital. An autopsy performed the following day by the deputy coroner revealed that Lincoln had died from exsanguination due to perforation of the right common iliac artery and vein, resulting from a gunshot wound to the abdomen.

{¶6}    At the crime scene, Williams had given police Lincoln's cell phone. The police also had recovered a Wolf 9 mm Luger casing on the sidewalk, along with a white t-shirt, white leather jacket, a belt that Lincoln had been wearing, and a blue tooth headset. Medical personnel had removed Lincoln's t-shirt and jacket so that they could render aid to Lincoln at the scene. Police escorted Williams to an unmarked police car where she gave them a description of the two men who had perpetrated the crime and a brief account of the shooting.

{¶7}    That night, police detectives called Williams at home and she provided them with a more detailed account of the shooting. Williams told police that she had been walking back from the store when she had seen Lincoln walking on the street. It was a nice day and she was admiring Lincoln's outfit. He was wearing jeans with a white leather jacket and t-shirt. She knew Lincoln through her son, who was supposed to meet Lincoln later that evening. She was planning to tell Lincoln that her son had plans and would not be able to meet him that night. As she was walking towards Lincoln, she saw two young men walking very close behind him. One man was wearing a yellow shirt and the other man was wearing a red shirt. She thought that the shorter of the two men, who was wearing a yellow shirt, was going to hug Lincoln, but instead he pressed a black gun in Lincoln's abdomen and shot him. Lincoln took his sunglasses off and handed them

3

over to the man with the yellow shirt. He then leaned into the man and slid down to the ground. The shooter then went through Lincoln's pockets and said, "I got that fool. I caught him slipping" before running through the park with the other man. She ran to Lincoln and tried to comfort him until police arrived.

{¶8} Greg Master, an uninterested bystander, also contacted police that night. He informed police that he had witnessed the shooting. He traveled to the police station where he was interviewed. Master told police that he had been walking to the store for a neighbor when he had seen two young men walking through the park. One of the men was wearing a yellow shirt and had tattoos on his neck. He looked to be 14 or 15 years old because he was so short. As the two men got closer to him, he saw the man in the yellow shirt pull out a black gun. He stepped into the street because he did not know what they were going to do. He watched as the two men approached another man on the next corner. They walked like they were going to go past him, but just as they walked past him, they turned around, and the man in the yellow shirt stuck the gun in his side and shot him. The man fell forward. The man in the yellow shirt then put the gun back down in his shorts. The men then took "glasses or something" off of him. They walked back through the park, laughing like nothing happened. Then they started running. A woman then went to the victim and told him that everything was going to be okay.

{¶9} That same night, police also interviewed Lincoln's 14-year-old cousin, Albert Lewis. He told police that he had been playing basketball in the park nearby, when he had heard gunshots and had seen two men bending down to take something from his cousin. He said the men were young and were wearing yellow and blue shirts. He told police the man in the yellow shirt had the gun.

{¶10} Roughly two weeks after Lincoln's murder, police separately showed Williams, Lewis, and Master a photo array, which included Davenport's photo. All three

4

witnesses identified Davenport as the shooter. Lewis told police he was 50 percent sure that Davenport was the shooter, while Master told police that he was 90 percent sure that Davenport was the shooter.

{¶11} Twenty-one days after Lincoln's murder, Davenport was arrested, advised of his *Miranda* rights, and interviewed by the police. In his first interview, Davenport told police that he had heard on the news that someone had "got shot with sunglasses." Davenport further stated that "word on the street was they tried to say two short people did it, two young boys. That's what I heard on the news. Two short boys did it about 15." Davenport, however, vehemently denied any involvement in the shooting. Police had also arrested Davenport's friend, Donte Martin, for a separate offense, and questioned him about Lincoln's murder.

{¶12} While Davenport and Martin were in custody, the police executed a search warrant for an apartment where they had been staying. In the search, the police recovered from a bedroom a yellow embroidered zip-up jacket, a plastic bag containing six Wolf 9 mm Luger cartridges, and a pair of Polo brand canvas shoes in a box. They also recovered from a bookshelf in a separate bedroom, a FC 9 mm plus JHP cartridge, one Wolf 9 mm Luger cartridge in a piece of plastic, and one CBS 45 caliber cartridge. The Wolf 9 mm Luger cartridges were the same type and brand as the casing that the police had recovered at the scene of Lincoln's murder.

{¶13} Following the search and the interviews, the police released Martin. Davenport, however, remained in custody. While Davenport was housed at the Hamilton County Justice Center, he made a series of telephone calls to his father and to Charae Henson, his former girlfriend and the mother of his son. All phone calls made by inmates are recorded and stored. Davenport's calls were recorded and played for the jury. In phone calls made the night of his arrest and the following day, Davenport can be

heard discussing his arrest with his father. His father said, "Teddy must be telling on you. Little Rob. So that's plain to see right there." Later on in the conversation, his father said, "Oh no, Little Rob, you weren't there for that." Davenport then replied, "I know." His father then said, "You wasn't there for that. Me, and you, and Charae was in my car with me. You wasn't there with that." Davenport then said, "I was with you." His father replied, "You was with me."

{¶14} In a later conversation between Davenport and his father, his father said, "You're going to get this goddam girl, Red, and she gonna be your goddam witness. You was with me." Later that same night, Davenport called Henson and said, "Hey you remember that day?" Henson said, "What day, Rob?" Davenport said, "That me, you, and my daddy went to get Montay from daycare when dude died. Yeah." Later in the same conversation Davenport said, "But you remember that day, though when me, you, my daddy went to get my son though, right?"

{¶15} Davenport called Henson back a little later, and said, "That's how you need to get my phone -- that's how you need to get my phone turned off baby. Do you hear me? The detectives got it. They using -- they trying to use my shit for evidence. I need my phone turned off." Davenport later said, "Because I was with you that day. Do you feel me? I really was, though, man." He later said again, "I was really right there next to you, though, bro. I really was, though." Henson finally said, "I know you wouldn't do it."

{¶16} In another conversation with his father, Davenport said in response to a question from his father about where Lincoln had been shot, "He was shot in his right kidney, right stomach. Because Teddy grabbed him with his left arm, and he shot him with the right." Davenport said later in the same conversation that he was going to need an alibi. His father replied, "Charae going to be your alibis. [sic] I'm going to get -- on

that -- I'm going to get on that -- I'm, dad -- I'm going to get on that witness stand. We is going to say that we rode past there and you was with me."

{¶17} Later on in a three-way call among Henson, Davenport, and his father, Davenport said, "And Charae, but look my story is, bro, me and you went to pick up our son from daycare. You hear me?" In another call, Davenport asked Henson, "Did you see Teddy when he shot the dude? Henson replied, "No." Davenport said, "It was in his stomach, you hear me?"

{¶18} Davenport was interviewed again by police the following day. He told police that he had been at the scene of the murder and had possessed a gun, but that he had seen Martin, whose nickname is "Teddy," and another man, DeShaun, shoot and rob Lincoln. According to Davenport, he and the two men had walked with Henson to pick up his son from daycare. Lincoln had been wearing a pair of "Carties."

{¶19} Davenport and Henson had then crossed the street and had overheard Teddy and DeShaun talking about how they wanted a pair of Carties like Lincoln's, and how they were planning to rob the "guy up the street who was wearing Carties." Davenport said that Teddy had been wearing a yellow t-shirt with lions on it and that DeShaun had been wearing a white t-shirt, jeans, and red Polo shoes. Davenport and Henson had watched as Teddy and DeShaun robbed the guy. Davenport said that when the guy had started to struggle for the gun, Teddy had shot him in the stomach.

{¶20} Davenport told police that Teddy had grabbed the guy's glasses and had taken his wallet, while DeShuan had stood there looking. Then Teddy and DeShuan had taken off running through the park. Davenport and Henson then had walked to Henson's house. Davenport had stayed at Henson's house until the police had cleared the scene. During that time, Davenport and Henson had argued because she had told him that he should have stopped them from shooting and robbing the guy. He told

police that Teddy had sold the sunglasses. Davenport also told police that they could contact Henson, who would confirm that he was with her at the time of the murder.

{¶21} The police, however, had already shown Lewis and Williams a photo array, which contained Donte Martin's photo. Neither of them had selected Martin's photo from the array. Following Davenport's interviews, Master was shown the same array with Donte Martin's photo, as well as an array that contained DeShaun Coleman's photo, but he did not identify either man as being involved with Lincoln's murder.

{¶22} In the meantime, the police interviewed Henson and DeShaun Coleman. They also obtained a search warrant for the contents of Davenport's cell phone and his cell phone records. The cell phone records showed that Davenport had made a series of phone calls and text messages both before and after the time of the murder, but none at the time of the murder. Police had also begun testing a number of items that they had recovered at the crime scene and in Davenport's apartment for finger prints and contact DNA. The police were unable to recover any fingerprints on any of the items, and only found Lincoln's DNA on the cell phone.

{¶23} Police, however, continued to monitor Davenport's phone calls at the jail. In those calls, Davenport had told his father that he had a gun the day of the murder and hid the gun in Henson's house. Davenport's father told Davenport that he had gone to Henson's house and picked up the gun. In another phone conversation, Davenport's father asked him, "What's up with DeShaun, bro?" Davenport had replied, "Man, he ain't have nothing to do with it. But you need to find DeShaun and tell DeShaun to tell these motherfuckers who really did this shit, bro?"

{¶24} In several phone calls with a woman named Rhonda, Davenport told Rhonda, when she was complaining that she did not have any money, that she should go get two of his "bangers" (guns) and sell them. Davenport also told Rhonda that she

should call Crimestoppers and tell them that he was not involved in the murder: "Tell them bitches he didn't do that, you bitches, and hang up on their ass, you got me." When Rhonda mentions in a later conversation that she knows one of the state's witnesses, Davenport said, "Next time you see her, Bro, call this number for real, Bro. This is what – I mean, I'm going to, I'm fittin' to write it in this letter for you tonight, Bro. I am fittin' to write you everything, fittin to write everything. Bro, that's dead. We are fittin' to put that to a cease, Bro. Ooh this dirty bitch, man. I don't even know this ho, but that's I bet that one of their witnesses, though." Rhonda then said, "Man, I hope she ain't." Later in the same conversation, Davenport said, "Man, when you see that broke bitch, motherfucking, give her broke ass four bands."

{¶25} Davenport later told Rhonda in another conversation, "Hey, though, but my people said if your grandma and your uncle come to court, they give them 200 apiece, and just say they ain't see nobody – I mean they couldn't see from where they were sitting there." Later on in the same conversation, Davenport said, "Tell JJ he can get some cheese. You hear me." Rhonda replied, "My people ain't going to come to court." Davenport then said, "Man, not for the money?"

### Trial Court Proceedings

{¶26} Davenport was subsequently indicted for aggravated murder under R.C. 2903.01(B), felony murder under R.C. 2903.02(B), aggravated robbery under R.C. 2911.01(A)(1), and having a weapon while under a disability under R.C. 2923.13(A)(3). The aggravated-murder, felony-murder, and aggravated-robbery charges were each accompanied by a three-year-firearm specification. Davenport pleaded not guilty.

{¶27} Prior to trial, the state, fearing intimidation of its civilian witnesses, filed a motion seeking nondisclosure of those witnesses until trial. Davenport filed a motion

to compel the disclosure of all witness and a motion to suppress the eyewitness identification. The trial court denied both of Davenport's motions.

{¶28}    Seven days prior to trial, the trial court held a hearing on and granted the state's motion for nondisclosure. On the first day of trial, the state disclosed the names and addresses of the civilian witnesses to Davenport's counsel. Davenport's counsel moved to dismiss the indictment, arguing that the state had violated his right to receive evidence against him and hampered his counsel's ability to adequately prepare his defense for trial. The trial court denied Davenport's motion to dismiss, but gave his counsel a one-month continuance to prepare for trial.

{¶29}    Following the month-long continuance, Davenport's trial commenced before a jury. All three eyewitnesses to the shooting, Albert Lewis, Agnes Williams, and Greg Master, testified at trial. Although Williams and Master testified consistently with their statements to police, and stated they were 100 percent positive that Davenport had shot and robbed Lincoln, Lewis testified that he was less than 50 percent sure that Davenport had shot his cousin. The state also presented testimony from several police officers, an assistant coroner, three criminalists, a serologist, a Cincinnati Bell records custodian, Lincoln's mother and stepfather, an employee for the telephone service provider for the jail, and Detective Wloszek.

{¶30}    Davenport presented testimony from a police officer, Carla Butler, the director of his son's daycare, and Henson. The officer testified that he had spoken with Williams the day of the murder, but that he had mistakenly written down in his notes that Williams had said the shooter was taller than the victim, when Williams had actually said that she was taller than the shooter. Butler testified that she had been employed with the daycare for only a year and two months. The normal procedure at the daycare was for parents to sign the children in and out on an attendance sheet.

Butler testified that the attendance records showed that Davenport's son had attended daycare the week of the murder. On cross-examination, Butler was asked about the difference between the attendance sheet for the week of the murder, which was blank for Davenport's son, and three other attendance sheets that the state had obtained where children, including Davenport's son, had been signed in and out, or if there was no signature, the word "out" had been written in place of the signature. Butler replied that she could not explain the discrepancy in the records.

{¶31} Henson testified that at the time of the shooting she had been a senior at Woodward High School. During that time, she was in the habit of taking her son to daycare every morning. On the day of the shooting, she rode the bus after she got out of school and arrived at her bus stop at approximately 4 p.m. When she had exited from the bus, Davenport had been across the street with his friends, Teddy, Rod, and DeShaun. When she reached the group, she asked Teddy and Rod if they knew her son's daycare teacher because she wanted to see him or her. The group then proceeded to the daycare.

{¶32} The normal procedure at the daycare was for parents to sign the children in and out, but she could not recall signing her son out that day. The group did not stay long because her son's teacher had already left for the day. After leaving the daycare center, they proceeded toward her home on Hickory Avenue. Soon after leaving, the group split up, with Teddy and DeShaun crossing to the other side of the street. Davenport was carrying their son and talking to Rod.

{¶33} Not long after, she and Davenport started to walk down Hickory, and were near her home when they heard a gunshot. She did not look back, but instead continued to walk toward her home. After the gunshot, Davenport took their son inside her home. He then handed their son to her and went up the street to see what had

happened. Henson could not recall seeing Davenport the rest of the evening. She was contacted by the police, who came to her home two weeks later. Her father took her to the police station where she gave a statement.

{¶34} At the conclusion of the trial, the jury found Davenport guilty of all the charges and firearm specifications. The trial court imposed an aggregate prison sentence of 36 years to life. It merged the murder and aggravated robbery and their accompanying gun specifications into the aggravated murder and its gun specification; it imposed an indefinite prison term of life with parole eligibility after 30 years for the aggravated murder, a 36-month prison term for the weapons under disability offense, and a three-year prison term for the gun specification to the aggravated murder; and it ordered that the prison terms be served consecutively.

### Certificate of Nondisclosure

{¶35} In his first assignment of error, Davenport argues that the trial court abused its discretion and violated his due-process rights by granting the state's certification of nondisclosure of the names and addresses of all the civilian witnesses it intended to call at trial. He claims that the state's certification lacked case-specific reasoning and that he was prejudiced by the state's use of the certification to hide exculpatory evidence from him in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

{¶36} The granting or overruling of discovery motions in a criminal case rests within the sound discretion of the trial court. *See State v. Parson*, 6 Ohio St.3d 442, 445, 453 N.E.2d 689 (1983). Crim.R. 16 governs discovery in criminal cases. Although Crim.R. 16(I) requires each party to provide to the opposing counsel a written witness list, Crim.R. 16(D) permits the prosecuting attorney to decline to

disclose to the defendant the names of witnesses as long as the prosecutor certifies that nondisclosure is for one of the five reasons enumerated in the rule.

{¶37} One of those enumerated reasons is if "[t]he prosecuting attorney has reasonable, articulable grounds to believe that disclosure will compromise the safety of a witness, victim, or third party, or subject them to intimidation or coercion." Crim.R. 16(D)(1). Crim.R. 16(D)(5) provides that the state's reasonable, articulable grounds for nondisclosure "may include, but are not limited to, the nature of the case, the specific course of conduct of one or more parties, threats, or prior instances of witness tampering or intimidation, whether or not those instances resulted in criminal charges, whether the defendant is pro se, and any other relevant information." *See State v. Williams*, 1st Dist. Hamilton No. C-130277, 2014-Ohio-1526, ¶ 14-15; *State v. Hernandez-Martinez*, 12th Dist. Butler No. CA2011-04-068, 2012-Ohio-3754, ¶ 25.

{¶38} Ohio appellate courts, including this court, have held that "as long as the reason for the nondisclosure satisfies one of the factors listed in Crim.R. 16(D), an oral certification during a hearing before the parties is sufficient." *See Williams* at ¶ 18, citing *State v. Hebdon*, 12th Dist. Butler Nos. CA2012-03-052 and CA2012-03-062, 2013-Ohio-1729 ¶ 49; *see also State v. Blake*, 2012-Ohio-3124, 974 N.E.2d 730, ¶ 18 (12th Dist.); *State v. Thompson*, 6th Dist. Lucas Nos. L-08-1208 and L-09-1214, 2011-Ohio-5046, ¶ 128; *State v. Collins*, 8th Dist. Cuyahoga No. 89529, 2008-Ohio-578, ¶ 58.

{¶39} During discovery, the state filed a motion for certification in support of its nondisclosure of several witnesses pursuant to Crim.R. 16(D). Although this initial filing was generic and did not provide any case-specific

13

reasoning to justify the certification, a hearing on the certification was held before the presiding criminal judge seven days prior to trial. *See* Crim.R. 16(F).

**{¶40}** Two prosecutors and defense counsel were present at the hearing. The prosecutor provided details regarding the intimidation of state's witnesses by Davenport's family members. Detective Wloszek was sworn and testified that, as a lead investigator on Davenport's case, he was aware that Davenport, his family, and his friends had tried to identify the state's witnesses and contact them. Some witnesses were so concerned for their safety that they had contacted the Cincinnati police to report the contacts. Police squad cars had been dispatched to take aggravated-menacing reports in some instances.

**{¶41}** Because the detective's case-specific testimony was sufficient to justify the state's need for nondisclosure, we cannot say the trial court abused its discretion in finding that the prosecution had complied with Crim.R. 16(D) and had not abused its discretion by withholding the names of the state's witnesses until trial. *Williams*, 1st Dist. Hamilton No. C-130277, 2014-Ohio-1526, at ¶ 18-20. As a result, we find Davenport's first argument meritless.

**{¶42}** Davenport next argues that the nondisclosure violated his due-process rights under *Brady*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. Under *Brady*, the prosecutor is obligated to disclose all material evidence favorable to the defense on the issue of guilt or punishment. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481.

14

{¶43} Here, however, the state disclosed the identities of the civilian witnesses at the beginning of the trial. Upon disclosure, Davenport sought and was granted a one-month continuance to review the witness list and prepare before his trial commenced. Because the state disclosed all the witnesses and favorable evidence to him prior to trial, there can be no *Brady* violation. *See, e.g., Hernandez-Martinez*, 12th Dist. Butler No. CA2011-04-068, 2012-Ohio-3754, at ¶ 21, citing *State v. Bradley*, 4th Dist. Scioto No. 1583, 1987 Ohio App. LEXIS 8824, *11 (Sept. 22, 1987). We, therefore, overrule his first assignment of error.

### *Prosecutorial Misconduct*

{¶44} In his second assignment of error, Davenport argues that multiple instances of prosecutorial misconduct during the trial and closing arguments denied him a fair trial.

{¶45} In order to reverse a conviction based on prosecutorial misconduct, the alleged misconduct must have deprived the defendant of a fair trial. *See State v. Fears*, 86 Ohio St.3d 329, 332, 715 N.E.2d 143 (1999). The prejudicial effect of the alleged misconduct must be considered in the context of the entire trial, and not simply the immediate context in which the misconduct occurred. *See State v. Maurer*, 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1984).

{¶46} Davenport first claims that the prosecutor improperly elicited testimony about witness intimidation during his direct examination of Police Officer Marcus McNeil. He argues that the prosecutor was permitted to improperly elicit testimony from the officer, over objection, that there was a low level of cooperation from residents in the Bond Hill, Roselawn, and Avondale neighborhoods, and that "there are a lot of eyes and ears in the neighborhood." But as Davenport himself points out, on cross-examination Officer McNeil testified that his role during the

investigation was limited to collecting evidence and that he had no personal knowledge of witnesses refusing to cooperate or being intimidated in Davenport's case. When the prosecutor tried on redirect to elicit additional testimony about witness intimidation, the trial court sustained defense counsel's objections to the testimony. We fail to see how the elicitation of these two statements denied Davenport a fair trial.

{¶47} Davenport next points to questioning by the prosecutor with respect to Agnes Williams during which she was asked if she wanted to testify at trial, if she knew she was a protected witness, and if she knew her identity in the community had been compromised. He argues such testimony was improper. Finally, Davenport argues that such improper witness-intimidation testimony reached "critical mass" when the state asked Williams about visits she had received from Davenport's father. But the record reflects that defense counsel objected to only part of these questions. The trial court sustained counsel's objection to the last question and it instructed the jury to disregard Williams's answer. We fail to see how the prosecutor's question and the witness's comment denied Davenport a fair trial. Further, any error that may have occurred in the admission of the other testimony and statements did not deny Davenport a fair trial.

{¶48} Davenport next alleges that the prosecutor improperly elicited victim-impact evidence from Lincoln's mother, Angela Lewis-Thiam, and his stepfather, Moustapha Thiam, about how they identified his body at the hospital. Davenport, however, did not object to any of this testimony. Thus, we review its admission for plain error. While we agree the testimony had no connection to the offenses and was, therefore, inadmissible, we cannot conclude that the testimony denied Davenport a fair trial given that the testimony was brief and not overly

emotional, and that the trial court instructed the jury that sympathy should not sway its verdict. *See State v. Neyland*, ___ Ohio St.3d ____, 2014-Ohio-1914, ____N.E.3d ___, ¶ 147-150.

{¶49} Davenport further claims the prosecutor committed misconduct by failing to redact evidence of gang membership from his statement to police, and by making a reference to a "known DNA report," which he argues implied that he had previously come to the attention of law enforcement. We cannot conclude that either instance, even if improper, denied Davenport a fair trial.

{¶50} Finally, Davenport argues that he was deprived of a fair trial because, in closing argument, the prosecutor engaged in misconduct by: (1) "stating that the evidence relating to a robbery applied only to Davenport's purpose in committing the homicide offenses, even though the state had to prove a robbery occurred to prove aggravated murder;" (2) stating that, if Davenport were to be acquitted, Donte Martin, his accomplice, would never be charged; (3) intimating that Henson was a liar by saying that she had "fake crocodile tears;" and (4) referring to the "climate of intimidation" to bolster Williams's credibility.

{¶51} A prosecutor is afforded wide latitude in closing arguments. *State v. Benge*, 75 Ohio St.3d 136, 142, 661 N.E.2d 1019 (1996). A review of the record indicates that the prosecutor's statement regarding Donte Martin was made in rebuttal to defense counsel's arguments and was based upon the evidence at trial. The prosecutor's characterization of Henson as lacking credibility was also based on the evidence in the record relating to her inconsistent statements at trial and in her phone conversations with Davenport. *See State v. Watson*, 61 Ohio St.3d 1, 10, 572 N.E.2d 97 (1991). The prosecutor's comment referencing the climate of intimidation was also proper to rebut Davenport's claims in closing that Williams had been

mistaken in her identification. Thus, we cannot conclude these remarks were improper. Furthermore, any misstatement of law the prosecutor may have made was corrected by the trial court, when it correctly instructed the jury on the law. *See State v. Bey*, 85 Ohio St.3d 487, 496, 709 N.E.2d 484 (1999). As a result, we overrule the second assignment of error.

### *Motion for a Mistrial*

{¶52} In his third assignment of error, Davenport claims the trial court committed error by failing to grant his motion for a mistrial.

{¶53} The decision whether to grant a mistrial lies within the trial court's discretion. *See State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987). An appellate court will not reverse a decision granting or denying a mistrial absent an abuse of discretion. *See State v. Johnson*, 2013-Ohio-2719, 994 N.E.2d 896, ¶ 24 (1st Dist.). "Mistrials need be declared only when the ends of justice so require and when a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

{¶54} Shortly after the jury had retired to deliberate, Davenport's counsel orally moved for a mistrial pursuant to Crim.R. 33(A)(2). He argued that the prosecuting attorney had violated a separation order by directing Detective Wloszek, who had been a witness in the trial and the state's representative, to personally interview three defense witnesses who lived at the same residence: Henson, Henson's mother, Angie Henson, and Henson's grandmother, Mildred Byers, prior to their testimony at trial. Davenport's counsel then proffered Byers's statements to him. According to defense counsel, Byers had said that the officer had made statements that "Robert Davenport is a bad person" and that "he has four murder cases on him right now, pending or will be pending."

18

{¶55} Davenport's counsel told the court that he had spoken with Detective Wlozsek and that Detective Wloszek had admitted to him that he was one of the people who had been ordered to speak with the women at their home. Counsel claimed that Detective Wloszek had violated the separation order and that the state had sent Detective Wloszek to talk to the witnesses about Davenport's bad character in an attempt to intimidate them from testfiying, and that they had failed to appear at trial, preventing counsel from calling them as witnesses.

{¶56} The prosecuting attorney told the court that she had not received a list of the defense's witnesses until voir dire had started. At that point, she asked Detective Wloszek and another detective to interview the witnesses to see what they had to say. She admitted that Detective Wloszek and the other detective had visited the three witnesses named on the list, but she stated that the detectives had done so prior to defense counsel's request for an order for separation of the witnesses, which had not been made until the end of voir dire. The prosecutor stated that if one of the witnesses had asked the detective a question about Davenport, he could answer the question truthfully without creating an ethical issue.

{¶57} The prosecutor further stated that all three defense witnesses had shown up to testify at the trial, but that defense counsel had not called them to testify, because defense counsel had requested a day's continuance to review the transcripts of Davenport's jail phone calls. The prosecutor had asked if the trial could proceed with the defense presenting testimony from these three witnesses. Defense counsel had said that he did not want to proceed, but wanted to review the transcripts from the phone calls. The prosecutor pointed out that Henson had testified at trial. The prosecuting attorney further stated that she had been prepared

to cross-examine the other two witnesses, but for reasons unknown to the state, they did not testify. After hearing counsels' arguments, the trial court denied the motion.

{¶58} Davenport argues that the trial court's failure to declare a mistrial resulted in a violation of his right to compulsory process. In all criminal prosecutions, a defendant has the constitutional right to compulsory process for obtaining witnesses in his favor. *See* Sixth Amendment to the U.S. Constitution; Article I, Section 10, Ohio Constitution. But to establish a violation of this right, the defendant must make a plausible showing of how the witness's testimony would be "both material and favorable to his defense." *See United States v. Alenzuela-Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982).

{¶59} Based upon our review of the record, we cannot conclude that Davenport has made such as showing. Henson testified at trial and provided Davenport with an alibi. Although Angie Henson and Mildred Byers did not testify at trial, Davenport did not proffer their testimony for the record. Thus, neither the trial court nor this court could evaluate what prejudice, if any, Davenport had suffered from their failure to testify. As a result, we cannot conclude that the trial court abused its discretion in denying Davenport's motion for a mistrial. We, therefore, overrule his third assignment of error.

### Ineffective Assistance of Counsel

{¶60} In his fourth assignment of error, Davenport maintains that he was denied the effective assistance of counsel based upon defense counsel's failure to object to: (1) victim-impact evidence in the form of the victim's mother's and stepfather's testimony; (2) the witness-intimidation evidence and other-acts evidence; (3) Detective Wloszek's testimony about a computer aided dispatch—a printout of the 911 calls and the officers that responded to the crime scene ("CAD

report"); and (4) leading questions relating to photo-identification information. He also argues defense counsel was ineffective for failing to call Detective Wloszek in support of the motion for a mistrial.

{¶61} To prevail on those arguments, Davenport "must show that his counsel's representation fell below an objective standard of reasonableness" and that he was prejudiced by counsel's deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is demonstrated by a showing "that there is a reasonable probability that, but for the errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at 694. Both prongs must be met to demonstrate ineffective assistance of counsel. *Id.* at 697. It is presumed that a properly licensed attorney is competent and ineffective assistance cannot be based on debatable tactical decisions. *See State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989).

{¶62} Davenport first complains that defense counsel should have objected to the testimony of Lincoln's mother and stepfather. He fails to identify, however, what parts of their testimony were objectionable. We cannot conclude that defense counsel was ineffective for failing to object to their testimony. As we stated in our resolution of the second assignment of error, their testimony was brief, and counsel may have tactically decided not to object to their testimony to minimize the jury's attention to it. *See State v. Mundt,* 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 89-91. The trial court, moreover, instructed the jury that it should not let sympathy sway its verdict. As a result, it is unlikely the result of the proceeding would have been different had counsel objected and the testimony been excluded. *See id.*

{¶63} Davenport also argues that his counsel was ineffective for failing to object to the witness-intimidation testimony. But as set forth in our resolution of the second assignment of error, much of this evidence was properly objected to and excluded during the trial. Other portions were admissible or did not rise to the level of plain error. Defense counsel cannot have been said to be ineffective for failing to object to those portions that were otherwise admissible. Furthermore, any failure by counsel to object to the remaining evidence is not outcome determinative, given the state's overwhelming evidence against Davenport.

{¶64} Davenport next argues that his counsel was ineffective for failing to object to police references to the "Midget killers" during his interrogation or to request a limiting instruction following those comments. But we cannot conclude that the references were inadmissible hearsay. Rather, they were designed to elicit a response from Davenport during his interrogation. Counsel's failure, moreover, to request a limiting instruction, may have been a matter of trial strategy. Counsel may have chosen not to object to the passing reference to avoid drawing the jury's attention to the reference. Moreover, we conclude that error, if any, in the admission of this testimony was harmless, given the state's overwhelming evidence of Davenport's guilt. *See State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983).

{¶65} Davenport next faults counsel for failing to call Detective Wloszek to testify in support of the motion for a mistrial based on the state's claimed witness intimidation. Counsel, however, was able to summarize the detective's statements in a way beneficial to Davenport. Thus, counsel's decision not to call Detective Wloszek may have been a matter of trial strategy. Davenport's claim, moreover, that this additional testimony would have benefited his motion is more suitable to

postconviction relief, where additional testimony from the Detective Wloszek, could be presented. *See State v. Ushry*, 1st Dist. Hamilton No. C-050740, 2006-Ohio-6287, ¶ 43; *see also State v. Wallace*, 10th Dist. Franklin No. 08AP-2, 2008-Ohio-5260, ¶ 59. Thus, Davenport can demonstrate no prejudice from his counsel's inaction.

**{¶66}** Finally, based upon our review of the record, we cannot conclude that defense counsel's failure to object to Detective Wloszek's testimony regarding the CAD report and the leading questions regarding the photo identifications was ineffective or outcome determinative. We, therefore, overrule Davenport's fourth assignment of error.

### Crim.R. 29, Sufficiency and Weight of the Evidence

**{¶67}** In his fifth assignment of error, Davenport contends that the trial court erred in overruling his motions for acquittals under Crim.R. 29. In his sixth and seventh assignments of error, Davenport argues that his convictions were supported by insufficient evidence and were contrary to the manifest weight of the evidence. We address these assignments together.

**{¶68}** The standard of review for the denial of a Crim.R. 29 motion is the same as the standard for sufficiency. *See State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus. In reviewing a challenge to the sufficiency of the evidence, this court must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In addressing a manifest-weight-of-the-evidence challenge, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses,

and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387.

{¶69} Three eyewitnesses identified Davenport as the shooter. Lewis testified that he was playing basketball when he heard a gunshot and then he saw "two guys kind of bent over" before they took off running through the park. Lewis testified that he did not know Davenport, but he picked him out of a lineup 13 days after the murder and was 50 percent sure that he was the shooter. Although Lewis could not initially recall the descriptions he had given police of the shooter and the accomplice, he did recall telling police on the day of the murder that the man with the gun had a yellow shirt.

{¶70} Master testified that he was walking up the street close to the entrance of the park when he saw Davenport and another man walk up to Lincoln. He saw Davenport shoot Lincoln and take glasses "or something" from Lincoln. He then heard Davenport laugh as he walked and then ran through the park. Master said he was so close to the shooting that he had to step out into the street because he did not want to get shot, and that when Davenport walked by him he was close enough that "they could have shaken hands." He further stated that immediately after the shooting a lady came to Lincoln's aid and was comforting him until the police arrived. He called police the night of the murder and was transported to the police station, where he told police what he had seen. Sixteen days later, he was shown a photo lineup containing Davenport's photo, and he picked him out as the shooter. At the time he viewed the array, Master told police he was 90 percent certain that Davenport was the shooter. He testified that after seeing Davenport,

who had a tattoo on his neck, in person at trial, he was 100 percent sure Davenport had shot Lincoln.

{¶71} Williams testified that she was crossing the street at the time of the murder. Her eyes were focused on Lincoln, whom she knew through her son. She was admiring Lincoln's outfit and wanted to say hello. As she watched Lincoln walk down the street, she saw two men approach him. She thought the man in the yellow shirt was going to embrace Lincoln, but instead he pulled out a gun and shot him in the stomach. She said the man in the yellow shirt took Lincoln's sunglasses, went through his pockets, and took his cell phone, but then dropped the phone on the ground. According to Williams, the man in the yellow shirt then said, "Caught him slipping. I got that fool," before running away through the park. Williams ran to Lincoln and tried to comfort him until police arrived. She gave police his cell phone, and was interviewed by police at the scene and by phone later that night. Twenty-one days later, she was shown a photo lineup, and she identified Davenport as the shooter. She testified at trial, that she was 100 percent positive that Davenport had shot Lincoln.

{¶72} Physical evidence recovered by the police supported Williams's, Master's, and Lewis's identifications. The deputy coroner testified that Lincoln had died from internal bleeding due to a gunshot wound to his abdomen. She testified that the soot around the bullet hole on Lincoln's t-shirt was consistent with a gun being placed against his t-shirt at the time he had been shot. A search of Davenport's apartment revealed ammunition like that recovered at the crime scene. Davenport's cell phone records showed that he had not made any cell phone calls or sent text messages during the time of the murder. But immediately after the murder, he had begun contacting his father and Henson.

**{¶73}** The state also produced a series of recorded jail phone calls between Davenport and a number of individuals, including his father and Henson, following his arrest. In the calls, Davenport is heard discussing his possession of a gun the day of the murder and attempting to establish an alibi with his father and with Henson. Furthermore, Davenport stipulated to having a prior conviction for aggravated possession of drugs. When viewed in the light most favorable to the prosecution, this evidence could have convinced a reasonable trier of fact that Davenport had committed the offenses. Thus, the trial court did not err in overruling Davenport's Crim.R. 29 motion.

**{¶74}** Moreover, the jury, as the trier of fact, was in the best position to judge the credibility of the witnesses. Davenport gave two statements to police denying any involvement in the robbery and shooting death of Lincoln, and stating that Donte Martin had committed the murder. He also presented an alibi through testimony from Henson that he was with her and his son at the time of the shooting, but the jury was free to reject that testimony. *See State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). And based upon our review of the record, we cannot conclude that the inconsistencies in the testimony of the state's witnesses rendered their testimony so unreliable or unworthy of belief that the jury lost its way and created a manifest miscarriage of justice. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. We, therefore, overrule his fifth, sixth, and seventh assignments of error.

### *Consecutive Sentences*

**{¶75}** In his eighth assignment of error, Davenport argues that the trial court erred in imposing consecutive sentences. The state properly concedes the error.

{¶76} R.C. 2929.14(C) requires that trial courts make certain findings before imposing consecutive sentences. *State v. Alexander*, 1st Dist. Hamilton Nos. C-110828 and C-110829, 2012-Ohio-3349, ¶ 13 and 16. Under R.C. 2929.14(C)(4), the trial court must find that consecutive sentences are necessary to protect the public or to punish the offender. The court must also find that consecutive sentences are not disproportionate to the offender's conduct and to the danger the offender poses to the public. Finally, the court must find that at least one of the following applies: (1) the offender committed one or more of the offenses while awaiting trial or sentencing, while under a sanction imposed under R.C. 2929.16, 2929.17, or 2929.18, or while under postrelease control for a prior offense; (2) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct would adequately reflect the seriousness of the offender's conduct; or (3) the offender's criminal history demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. *Alexander* at ¶ 15.

{¶77} Consecutive sentences imposed without these findings are clearly and convincingly contrary to law. *See State v. Green,* 1st Dist. Hamilton Nos. C-120269 and C-120270, 2013-Ohio-1508, ¶ 6, citing *State v. Cowins*, 1st Dist. Hamilton No. C-120191, 2013-Ohio-277, ¶ 36. Our review of the record demonstrates that the trial court failed to make the findings necessary to support consecutive sentences either orally at the sentencing hearing or on a sentencing-findings worksheet. *See Alexander* at ¶ 16-17; *see also State v. Watkins*, 1st Dist. Hamilton No. C-120567, 2013-Ohio-4222, ¶ 17. As a result, we sustain the eighth assignment of error.

## *Conclusion*

**{¶78}** We, therefore, vacate the consecutive sentences and remand this cause to the trial court to determine whether consecutive sentences are appropriate, and if so, to make the necessary findings on the record. We affirm the trial court's judgment in all other respects.

Judgment affirmed in part, reversed in part, and cause remanded.

**HENDON, P.J,** and **DINKELACKER, J.,** concur.

Please note:
The court has recorded its own entry this date.