[Cite as *State v. Martin*, 2018-Ohio-1061.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-170117 |
| | | C-170126 |
| Plaintiff-Appellee, | : | C-170135 |
| | | TRIAL NO. B-1405503 |
| vs. | : | |
| HOWARD MARTIN, | : | |
| | | *O P I N I O N.* |
| Defendant-Appellant. | : | |

Criminal Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed  in C-170126; Appeals Dismissed in C-170117 and C-170135

Date of Judgment Entry on Appeal: March 23, 2018

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Paula Adams*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna,* for Defendant-Appellant.

**DETERS, Judge.**

{¶1} Defendant-appellant Howard Martin was indicted for attempted murder, two counts of felonious assault, and tampering with the evidence in connection with a knife attack on Michael DiPuccio. Martin filed a motion to suppress the pretrial identification of three eyewitnesses on the grounds that the arrest-scene show-up was impermissibly suggestive and not reliable. A jury found Martin guilty of all the charges.

{¶2} At sentencing, the trial court merged the two felonious-assault counts with the attempted-murder count. It imposed an 11-year prison sentence for the attempted-murder count and a 36-month prison sentence for the tampering-with-the-evidence count. It ordered the sentences to be served consecutively, for a total of 14 years in prison.

{¶3} As a preliminary matter, we note that Martin has filed two pro se notices of appeal, and his appointed appellate counsel also filed a notice of appeal. We sua sponte dismiss the two pro se notices of appeal, numbered C-170117 and C-170135, as duplicative of the appeal numbered C-170126 filed by counsel.

{¶4} In the appeal numbered C-170126, Martin raises six assignments of error: the trial court erred by failing to suppress the pretrial identification of three witnesses; Martin's convictions were based upon insufficient evidence and were contrary to the manifest weight of the evidence; the trial court erred by denying his mistrial motion, which was premised on prosecutorial misconduct during closing argument; Martin was denied the effective assistance of trial counsel; and the record does not support the trial court's imposition of maximum consecutive sentences. We find none of the assigned errors meritorious, and thus, we affirm the trial court's judgment.

*State's Evidence at the Jury Trial*

{¶5}   Around 9:00 a.m. on September 26, 2014, Michael DiPuccio was standing outside the William Howard Taft building ("Taft building") smoking a cigarette when he was hit from behind on the side of his face and the top of his head. DiPuccio turned and saw a shorter black man in front of him holding a hunting knife. The man tried to stab him, but missed.  DiPuccio began walking backwards.  The man stabbed at him again, and this time DiPuccio felt the tip of the knife on his chest. DiPuccio ran into the street to avoid being stabbed again.  Once there, he turned to see if the man was still chasing him.  But the man had turned, pulled up the hood on his sweatshirt, and begun walking in the opposite direction.  DiPuccio's face and head were bleeding profusely.  He walked back near the doors of the Taft building and sat down on the sidewalk to await emergency assistance.

{¶6}   At the time of the attack, law students Danyel Rickman and Terry Cannon had been walking across the street and were stopped at an intersection waiting for the traffic light to turn green. Cannon heard a man yell, and saw two men fighting in front of the Taft building.  He told Rickman what he had seen, and as they watched the two men, they realized it was not a fight, but a knife attack.  A shorter black man was attacking an older white man with a knife.  From their vantage point, they could see the attacker's face and his clothing.  Rickman called 911 and described the attacker as a black male wearing a skull cap and black clothing.   She indicated that he was holding a large butcher knife.   They observed the attacker cut the white man.  The white man kept retreating and ended up running into the intersection near where they were standing. The black man fled from the scene.  When traffic cleared, they walked over to the injured man.  His face was slashed and he was bleeding from his side.  They stayed at the scene to provide the police with a description of what they had seen.

{¶7}  Kelly Johnson, an attorney, was walking near the Taft building on his way to a court appearance, when he heard voices and his attention was drawn to the front of the Taft building.  He saw a taller white man with white hair and a shorter black man wearing a black hoodie, black pants, and black shoes.  The black man pulled out a large butcher knife and started slashing at the face of the white man. He cut the white man's face several times and he stabbed at the man's chest and stomach. Johnson called 911 to report the incident.  While talking with the 911 operator, Johnson continued to observe the attacker as he left the scene.  Johnson told the 911 operator that the security officers in the Taft building had exited from the building and had followed the attacker down an alley next to the building.  Johnson followed behind them yelling, "That's the person, that's the guy who did it."  He then saw the officers take the man into custody.

{¶8}  Melynda Machol, an assistant Hamilton County prosecuting attorney, was parking her vehicle in the parking lot behind the Taft building, when she saw a black man dressed in all black clothing coming from the alley next to the parking lot. He stood near a dumpster at the back of the parking lot for a few seconds and looked out into the rest of the parking lot.  As she pulled into her parking spot and gathered her things, he walked toward her car.  When she opened her car door, he crouched down near the right front of her vehicle.  As she walked by the front of her vehicle, the man stood back up and moved to the rear of her vehicle.

{¶9}  Almost simultaneously, Machol saw security officers coming from the Taft building and the alley.  Johnson, whom she knew, was also coming down the alley. The officers were screaming, and Johnson was yelling, "That's him, that's him."  The security officers moved toward the man that had been crouching near her vehicle.  At this point, the man had moved from her car to the center of the parking lot.  The

security officers ordered him to the ground and he complied. He was taken into custody with the assistance of other police officers that had arrived on the scene. Johnson moved closer to where the police had stopped the man and told the 911 operator that the police had apprehended the man who had committed the knife attack.

{¶10} Cincinnati police officer Andy Brown, who was in uniform and on patrol, responded to the scene of the attack. When he arrived, Martin had already been taken into custody and placed in the back seat of a police cruiser. Officer Brown separately approached Rickman and Cannon, who had remained on the scene, and interviewed them. Officer Brown asked them if they could identify the attacker. Rickman and Cannon indicated they had seen the attacker's face and could identify him. Officer Brown brought Rickman and Cannon individually to the police cruiser where Martin was sitting handcuffed and asked if they recognized him. Within 15-20 minutes of the attack, each identified Martin as the attacker based on his face and his clothing.

{¶11} Johnson had left the scene to attend a court appearance. Thirty minutes after the attack, he returned to the scene and approached a police officer. He told the officer that he had witnessed the attack and had contacted 911 to report the incident. The police officer asked Johnson if he could identify the attacker. When Johnson responded affirmatively, the officer walked him to a police cruiser, opened the door, and asked him if the person seated in the car was the person who had committed the attack. Johnson identified the man in the cruiser as the attacker. Johnson testified his identification of Martin had been based on watching him commit the attack and the police apprehend him immediately after the attack. At trial, Johnson, Cannon, and Rickman identified Martin as the perpetrator of the knife attack.

{¶12} Jeff Caldwell, a Hamilton County deputy bailiff, was providing security inside the front door of the Taft building, when a man entered and stated that someone

5

was being stabbed down the street. Caldwell and his partner, Rick Ideker, proceeded out the front door of the building toward the alley next to the building. They proceeded at a fast walk through the alley to the parking lot behind the building. They caught up with the attacker in the parking lot and ordered him to the ground. Caldwell identified Martin as the person he had apprehended.

{¶13} Dick Rusza, an office supervisor with the Hamilton County Sheriff's Office, was in charge of the property room at the Hamilton County Justice Center the day Martin was arrested. He testified that when Martin was processed he was wearing a black jacket, black pants, and a black shirt. Rusza identified a property intake form and a photo of Martin wearing a black hooded sweatshirt. He further testified that Martin's clothing had been returned to him upon his transfer to another facility.

{¶14} When police searched the area where Martin had been arrested, they had found a small knife propped against a mattress near the dumpster, a larger butcher knife underneath Machol's vehicle, and a black skull cap in the alley. At trial, Rickman identified the skull cap as being consistent with the hat she had seen the attacker wearing. Rickman, Cannon, Johnson, and DiPuccio identified the larger knife that had been recovered under Machol's car as the knife that the attacker had used to cut and stab DiPuccio.

{¶15} Robin Upchurch, the investigating police officer, testified that she had ordered the two knives to be tested for fingerprints. Derek Foote, the criminalist who had performed the fingerprint testing, testified that he did not obtain any useable fingerprints from the knives, and that once he had processed the knives for fingerprints, he could not process them for DNA evidence.

{¶16} DiPuccio testified that he had received 16 stitches to his face and head, and he had sustained a puncture wound to his chest. His medical records were

admitted into evidence. Martin did not testify or present any evidence. The jury found Martin guilty of all the charged offenses.

### *Identification Evidence*

{¶17} In his first assignment of error, Martin argues the trial court erred by denying his motion to suppress the pretrial identifications of Rickman, Cannon, and Johnson.

{¶18} Appellate review of a motion to suppress presents a mixed question of fact and law. The trial court, acting as the trier of fact, is in the best position to resolve factual questions and evaluate witness credibility. Therefore, we must accept the facts as found by the trial court as long as they are supported by competent, credible evidence. *See State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. We must independently review, however, the trial court's legal conclusions based on the facts to determine whether, as a matter of law, the facts satisfy the applicable legal standard. *Id.*; *see State v. Billups*, 1st Dist. Hamilton No. C-150500, 2017-Ohio-4309, ¶ 5.

{¶19} Martin argues that the one-person arrest-scene show-up in which Rickman, Cannon, and Johnson identified him was impermissibly suggestive. Martin challenges as suggestive the fact that he was the only suspect presented at the show-up, he was in handcuffs in the back seat of a police cruiser, and the police failed to resort to less suggestive means like a more traditional lineup. He further contends that the identifications were unreliable under the totality of the circumstances. He maintains that none of witnesses' observations satisfy the factors set forth in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

{¶20} In *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 24, the Ohio Supreme Court reiterated that "[t]he practice of showing suspects singly to

7

persons for purpose of identification, and not as a part of a lineup, has been widely condemned. But the ultimate focus in determining whether reversible error exists is not just on whether the practice was used, but on whether it was so suggestive as to create 'a very substantial likelihood of irreparable misidentification.' " The *Gross* court held that despite the taint of the show-up procedure, the identifications were nonetheless reliable. *Id.* at ¶ 25.

{¶21} In determining the reliability of a witness's pretrial identification, the court must examine the following factors: (1) the witness's opportunity to view the suspect at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the suspect, (4) the level of certainty expressed by the witness at the time of the identification, and (5) the length of time between the crime and the confrontation. *State v. Broom*, 40 Ohio St.3d 277, 284, 533 N.E.2d 682 (1988), quoting *Neil* at 198, quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In *State v. Madison*, 64 Ohio St.2d 322, 332, 415 N.E.2d 272 (1980), the Ohio Supreme Court found no reason to disapprove of a one-man show-up shortly after the alleged criminal act, stating, "[S]uch a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy." *Id.*, quoting *Bates v. United States*, 405 F.2d 1104, 1106 (D.C.Cir.1968).

{¶22} Assuming without deciding that the show-up procedure employed by the police was suggestive, we cannot conclude the trial court erred by failing to suppress the three witnesses' identifications where the totality of the circumstances and all five of the *Biggers* factors supported the trial court's finding that the witnesses' identifications of Martin were sufficiently reliable. All three witnesses had a good opportunity to view Martin during the commission of the crimes; they provided consistent and thorough descriptions of him to the police and to the 911 operator; they were certain of the

identification at the time; and they identified Martin within 30 minutes after the crime while their memories were still fresh. *State v. Ward*, 1st Dist. Hamilton No. C-140721, 2015-Ohio-2260, ¶ 20; *see State v. Lee*, 1st Dist. Hamilton No. C-160294, 2017-Ohio-7377, ¶ 36-37.

### R.C. 2933.83 does not Apply to a One-Person Show-Up

{¶23}   Martin also argues that the state failed to comply with R.C. 2933.83(B) which requires any law enforcement agency that conducts a live lineup to adopt specific procedures for conducting the lineup.   R.C. 2933.83(A)(7) defines a "live lineup" as an "identification procedure in which a group of persons, including the suspected perpetrator of an offense and other persons not suspected of the offense, is displayed to an eyewitness for the purpose of determining whether the eyewitness identifies the suspect as the perpetrator of the offense." The one-person show-up identification utilized by the police in this case does not satisfy the statutory definition of a live lineup. Thus, R.C. 2933.83 does not apply.   *See State v. Davis,* 8th Dist. Cuyahoga No. 101502, 2015-Ohio-1144, ¶ 15-17; *State v. Pressly*, 2d Dist. Montgomery No. 24852, 2012-Ohio-4083, ¶ 32-33; *State v. Barker*, 11th Dist. Portage No. 2013-P-0084, 2014-Ohio-4131, ¶ 45.

{¶24}   We hold that the trial court properly denied Martin's motion to suppress. Therefore, we overrule the first assignment of error.

### Weight and Sufficiency of the Evidence

{¶25}   In his second and third assignments of error, Martin argues that his convictions were based on insufficient evidence and were against the manifest weight of the evidence.

{¶26}   "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."   *State v. Thompkins*, 78

Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus. To meet the test for sufficiency, the state must present evidence from which a rational trier of fact could find the essential elements of each crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When examining a sufficiency claim, the court of appeals looks at the evidence in the light most favorable to the state. *Id.*

{¶27} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror." *Thompkins* at 387. It must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* The appellate court uses caution and reverses only when the evidence weighs heavily against the conviction. *Id.*

{¶28} Martin argues that the state failed to present sufficient evidence of his identity as the attacker because DiPuccio could not identify him at trial; Johnson testified that he may have lost sight of the attacker while calling 911; the state presented no fingerprint or DNA evidence connecting him to the attack; and he did not run from police when they confronted him. Although DiPuccio could not identify Martin as his attacker, Rickman, Cannon, and Johnson each identified Martin as the attacker both before the trial and at the trial. They each testified that they had witnessed Martin attack DiPuccio with a knife, cutting and stabbing him multiple times in the head, face, and body. They then saw Martin walk down the sidewalk and down an alley. Rickman and Johnson called 911 during the attack. Their calls were admitted into evidence and played for the jury. During his 911 call, Johnson stated

10

that he was following Martin so he could alert police to his whereabouts. Johnson can be heard on the 911 call telling the security officers to apprehend Martin. Contrary to Martin's assertions, Johnson testified at trial that he never lost sight of Martin and he was confident that Martin was the perpetrator of the offenses.

{¶29} Rickman, Cannon, and Johnson individually identified Martin as the perpetrator within 30 minutes of the offenses. Rickman's and Johnson's descriptions of the perpetrator's clothing at trial were consistent with the descriptions they had provided on the 911 calls. All three eye witnesses' descriptions were consistent with a photograph of Martin that had been taken the day of the offenses. Each testified unequivocally that Martin had been the perpetrator.

{¶30} The police apprehended Martin at the back of the building where DiPuccio had been attacked. Machol testified that she had seen a man matching Martin's description bend down near her vehicle in the parking lot behind the Taft building. The police recovered a skull cap in the alley, and two knives, one in the alley near the dumpster and one under Machol's car. DiPuccio, Rickman, Cannon, and Johnson identified the larger knife that had been recovered under Machol's vehicle as the knife that Martin had used to cut and stab DiPuccio. We hold that the state presented sufficient evidence to prove Martin guilty of attempted murder and tampering with the evidence.

{¶31} Martin also argues the jury's verdicts were against the manifest weight of the evidence because there was no physical evidence linking him to the incident, and the only evidence linking him to the offenses was Rickman's, Cannon's, and Johnson's identifications. This court must defer to the jury's finding that the testimony of Rickman, Cannon, and Johnson, who positively identified Martin as the perpetrator, was highly credible and indicative of Martin's guilt. Thus, the lack of

fingerprint or DNA evidence was not dispositive of Martin's guilt or innocence. *See State v. Lukacs,* 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 58 (1st Dist.); *State v. Byrd,* 1st Dist. Hamilton No. C-050490, 2007-Ohio-3787, ¶ 34; *State v. Nix,* 1st Dist. Hamilton No. C-030696, 2004-Ohio-5502, ¶ 67.

{¶32} Martin also contends that the testimony of the state's eyewitnesses was suspect. He points to minor inconsistencies in their testimony as to whether the attacker was wearing a hat or hoodie and whether he walked or ran following the attack. During closing argument, defense counsel highlighted these and other minor inconsistencies in the testimony of the state's witnesses, and pointed out what he perceived as flaws in the state's investigation. These inconsistencies do not render appellant's convictions against the manifest weight of the evidence. The jury was aware of these minor differences in the witnesses' descriptions and could reconcile them when determining their credibility. *See State v. Davenport*, 1st Dist. Hamilton No. C-130307, 2014-Ohio-2800, ¶ 74. Given the slight inconsistencies in the witnesses' descriptions, the jury did not lose its way by relying on Rickman's, Cannon's, and Johnson's identifications in finding appellant guilty. Accordingly, Martin's convictions are not against the manifest weight of the evidence. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Therefore, we overrule the second and third assignments of error.

### *Motion for Mistrial*

{¶33} In his fourth assignment of error, Martin contends the trial court erred by failing to declare a mistrial after the assistant prosecuting attorney improperly shifted the burden of proof during closing argument.

{¶34} In closing argument, the prosecuting attorney has wide latitude to summarize the evidence and zealously advocate the state's position. *State v. Richey,*

64 Ohio St.3d 353, 362, 595 N.E.2d 915 (1992). While the prosecution cannot shift the burden of proof to the defendant during closing argument, it can comment on the defense's failure to offer any evidence to support its theory of the case. *State v. Collins*, 89 Ohio St.3d 524, 528, 733 N.E.2d 1118 (2000). When examining a claim that the prosecutor's specific remarks were improper, the propriety of the remark must not be judged in isolation, but in light of the tenor and context of the entire closing argument. *See State v. Slagle*, 65 Ohio St.3d 597, 607, 605 N.E.2d 916 (1992). Improper remarks during closing argument are grounds for reversal only when they deny the defendant a fair trial. *State v. Maurer*, 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1984).

{¶35} The decision whether to grant a mistrial lies within the trial court's discretion. *See State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987). An appellate court will not reverse a decision granting or denying a mistrial absent an abuse of discretion. *See State v. Johnson*, 2013-Ohio-2719, 994 N.E.2d 896, ¶ 24 (1st Dist.). "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

{¶36} During his closing argument, defense counsel maintained that the state had failed to prove Martin's identity as the perpetrator because it had not presented any physical evidence linking Martin to the offenses. Defense counsel pointed out that the state had failed to test Martin's clothes, shoes, and the skull cap for DNA evidence and that it had only belatedly conducted fingerprint testing on the knives. Defense counsel argued that without this physical evidence, the state had failed to prove beyond a reasonable doubt that Martin was guilty of the offenses.

{¶37} During the rebuttal portion of her closing argument, the assistant prosecuting attorney pointed out that while the state had the burden to prove Martin guilty beyond a reasonable doubt, the evidence alluded to by defense counsel had been equally available to the defense. The assistant prosecutor asked the jury to consider why the defense had chosen not to test these items for DNA and fingerprints and to offer that evidence in its case. The assistant prosecuting attorney suggested that the absence of this physical evidence actually benefitted the defense, because it allowed defense counsel to argue the absence of this evidence required the jury to acquit Martin of the offenses. The assistant prosecutor agreed that while DNA and fingerprint evidence connecting Martin to the offenses would have made its case stronger, the evidence the state had presented at trial was sufficient for the jury to find Martin guilty of the offenses.

{¶38} Defense counsel objected to these remarks and asked to approach the bench. The assistant prosecutor told the jury that she was not saying the defense had the burden of proof. At a sidebar conference immediately thereafter, defense counsel argued the prosecutor's comments had improperly shifted the burden of proof to the defense and asked the court to grant a mistrial. The trial court denied the motion. In proceeding with her closing argument, the assistant prosecuting attorney told the jury that the state was not shifting the burden to the defense or arguing the defendant must present evidence.

{¶39} Martin contends that the prosecution's remarks gave the jury the impression that the defense had the burden of proof. We disagree.

{¶40} In closing arguments, the prosecution may comment on the evidence and may respond to arguments made by defense counsel and the failure of the accused or his counsel to offer any evidence in support. Here, the assistant prosecuting

14

attorney's response to the defense counsel's arguments was proper and contained no impermissible implications. *See State v. Collins*, 89 Ohio St.3d 524, 528, 733 N.E.2d 1118 (2000); *see also State v. Gulley*, 1st Dist. Hamilton No. C-850179, 1986 WL 958, *5 (Jan. 22, 1986); *State v. Conner*, 6th Dist. Lucas No. L-09-1159, 2010-Ohio-6500, ¶ 26-30; *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, 933 N.E.2d 317 ¶ 38-48 (10th Dist.) (holding similar remarks by the prosecution during closing argument to be proper comments on the evidence). Thus, the trial court did not abuse its discretion in denying Martin's motion for a mistrial. We, therefore, overrule the fourth assignment of error.

### *Ineffective Assistance of Counsel*

{¶41} In his fifth assignment of error, Martin argues he received ineffective assistance of counsel. Martin contends that defense counsel was unprepared to go to trial and should have sought a continuance at the outset of the trial to determine whether he wanted to testify at the trial. Martin asserts that the result of his trial would have been different had defense counsel communicated more thoroughly with him and been more prepared for trial. We disagree.

{¶42} To prevail on his claim of the ineffective assistance of trial counsel, Martin "must show that [his] counsel's representation fell below an objective standard of reasonableness" and that he was prejudiced by counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is demonstrated by showing "that there is a reasonable probability that, but for * * * [the] errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Both prongs of the test must be

15

met to demonstrate ineffective assistance of counsel. *Id.* at 697; *see State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

{¶43}  Martin's claims of ineffectiveness are belied by the record.  Martin was represented by two attorneys during the trial. Just prior to the start of the trial, they told the court that they had discussed with Martin both orally and by way of a written letter the state's offer of a plea deal with an eight-year prison sentence, and they had told Martin that if he proceeded to trial and was found guilty of all the offenses that he could be sentenced to 14 years in prison, but Martin had stated that he wanted to reject the plea deal and proceed to trial.

{¶44}  Defense counsel told the court that they had worked hard on the case, but that they were at a disadvantage, not because of their efforts, but because Martin would not share factual information about the case with them and would not tell them if he wanted to testify at trial.  One defense counsel told the court that he had reminded Martin that his case had been pending for two years and 134 days and that time was of the essence with the impending trial.

{¶45}  The trial court questioned Martin about defense attorneys' impression of the case, including the potential consequences of proceeding to trial, and asked Martin if he still desired to have his case tried to a jury.  Martin told the court that he wanted new attorneys.  The trial court denied his request, reminding Martin that it had denied his request for attorneys the day before.  The trial court told Martin that he had four prior attorneys, his current defense counsel knew what they were doing and they were zealously representing him.  Martin told the court that he still wanted to proceed to trial.

{¶46}  Following the presentation of the state's witnesses and the trial court's denial of his Crim.R. 29 motion, defense counsel informed the trial court on the

record that they were not going to present any evidence. Defense counsel then asked Martin if he had confidence in his attorneys' representation. Martin responded affirmatively. Defense counsel told the court that Martin had changed his mind and did not wish to testify. Counsel told the court that they had explained to Martin that it was certainly his 100 percent right to testify or not testify, and that Martin had decided not to testify. When asked by defense counsel if that was correct, Martin responded affirmatively. Immediately thereafter, in the presence of the jury, the defense rested without presenting evidence.

{¶47} Contrary to Martin's assertions, providing defense counsel additional time to prepare for trial would not have necessarily aided Martin's defense. Thus, we cannot say that his attorneys' failure to seek a continuance fell below an objective standard of reasonableness and constituted deficient performance. Martin, moreover, points to no evidence that defense counsel was unprepared to go to trial. *See State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 117. The record reflects that defense counsel vigorously represented Martin at trial. Although Martin had initially expressed discontent with defense counsel at the beginning of the trial, when asked by defense counsel during the trial if he had confidence in them, Martin answered affirmatively. The record reflects, moreover, that Martin's failure to testify at trial was the result of his own knowing and intelligent decision. Because Martin has failed to establish that defense counsel violated any essential duties or that he was prejudiced by defense attorneys' acts or omissions, we overrule the fifth assignment of error.

*Sentence*

{¶48} In his sixth assignment of error, Martin argues his aggregate sentence is contrary to law. He argues the record does not support the trial court's imposition of maximum consecutive sentences.

{¶49} When reviewing felony sentences, this court applies the standard articulated in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1 and 21-22; *State v. White*, 2013-Ohio-4225, 997 N.E.2d 629, ¶ 9-11 (1st Dist.). "Under R.C. 2953.08(G)(2), we may only modify or vacate [a defendant's] sentence if we 'clearly and convincingly find' that either (1) the record does not support the mandatory sentencing findings or (2) that the sentence is 'otherwise contrary to law.' " *White* at ¶ 9-11.

{¶50} The maximum prison sentences imposed by the trial court for the attempted-murder and tampering-with-the-evidence offenses were within the statutory range of prison terms for each of the offenses. *See* R.C. 2929.14(A). With respect to the trial court's imposition of consecutive sentences, the trial court must engage in a three-step analysis and make certain findings under R.C. 2929.14(C)(4). The court must find that the consecutive sentences are necessary either to protect the public from future crime or to punish the offender; the imposition of consecutive sentences is not disproportionate to the seriousness of the offender's conduct and the danger he poses to the public; and at least one of the conditions listed in R.C. 2929.14(C)(4)(a)-(c) applies.

{¶51} In *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus, the Ohio Supreme Court held that when a trial court imposes consecutive sentences, it must not only announce the requisite consecutive-sentencing findings at the sentencing hearing, but it must also incorporate those

findings into the sentencing entry. The trial court is not required to provide a "word-for-word" recitation of the language or to provide reasons to support the findings, as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings. *Id.* at ¶ 29.

{¶52} Despite Martin's assertions to the contrary, the record reflects that the trial court complied with *Bonnell.* At the sentencing hearing, the trial court orally announced the necessary findings for consecutive sentences. It stated that consecutive prison terms were necessary to protect the public from future crime and punish Martin for the offenses and were not disproportionate to the seriousness of his conduct and the danger he posed to the public, and "his criminal conduct and criminal history demonstrated consecutive sentences were necessary to protect the public from future crime." The trial court additionally stated that Martin's "failure to recognize his conduct [or] show remorse was alarming." The trial court was not required to give any reasons to support its findings. *See State v. McGee*, 1st Dist. Hamilton No. C-150496, 2016-Ohio-7510, ¶ 32, citing *Bonnell* at syllabus. The trial court incorporated these consecutive-sentencing findings into the sentencing entry.

{¶53} Because the record reflects that the trial court engaged in the required analysis and selected the appropriate statutory criteria to support its imposition of consecutive sentences, and the record amply supports the trial court's findings, Martin's sentences are not contrary to law. *See* R.C. 2953.08(G). Therefore, we overrule his sixth assignment of error and affirm the judgment of the trial court.

Judgment affirmed in C-170126;
Appeals dismissed in C-170117 and C-170135.

**MYERS, P.J.,** and **MILLER, J.,** concur.

Please note:

The court has recorded its own entry this date.

